1:23-mj-01902 BAH

**AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT**

I, TFO Albert Rodriguez, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.      I am a Police Officer with the Howard County Police Department and have been since September of 2018.  In March 2023, I became deputized as a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA).  As such, I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41.  I am currently assigned to the DEA Group 51 (Vice & Narcotics/Narcotics) Section as a TFO.  My current assignment involves investigating illegal narcotics activity, firearms violations, and drug and gang activity throughout the city of Baltimore.  Prior to becoming a Police Officer for the Howard County Police Department, I was a sworn police officer for the New Jersey Transit Police Department and the Baltimore City Police Department (BPD).  As a member of the BPD, I served in the BPD Western and Northeastern District Patrol Division and the Operational Intelligence Section as a detective.

2.      I have received specialized training in the manner and means by which drug trafficking occurs and the related use of firearms in furtherance of drug trafficking.

3.      I have participated in numerous investigations involving drug trafficking and firearms possession.  I have directly and indirectly participated in the arrest of numerous persons for these violations and have seized firearms and various amounts of heroin, cocaine, marijuana, and other illegal substances. I have been involved in the preparation and/or execution of over one-hundred search and seizure warrants.

4.      Through my training, knowledge, and experience, I have become familiar with manner and means by which traffickers engage in the sale of illicit drugs; the use of "stashes" and

"stash houses"; the prices, quantities, and packaging of illicit drugs; the use of couriers in the distribution of illicit drugs; the methods and modes of communication, and counter-surveillance techniques employed by drug traffickers; language, terminology, traits, actions, and codes used by drug traffickers; the manufacturing and processing of controlled dangerous substances; and methods of asset concealment utilized by dealers of illicit drugs. Additionally, I know based on my training, knowledge, and experience that drug traffickers commonly utilize vehicles to pick up and deliver controlled dangerous substances ("CDS"); meet with CDS customers, sources, and co-conspirators; and transport CDS and proceeds to stash locations and transport money to suppliers or third parties to pay for the CDS. I also know through my knowledge, training, and experience that CDS traffickers frequently use phones to communicate and carry out criminal activities. Specifically, I know through knowledge, training, and experience that members of drug trafficking organizations ("DTOs") often carry numerous phones in order to compartmentalize their contacts and to avoid detection by law enforcement.

5.     Based upon my training and experience, I have also learned that:

   a.     Drug traffickers keep and maintain records of their various activities. Such records are regularly concealed in a suspect's automobile, residence, office, and on his person, and that they take various forms. Documents commonly concealed by traffickers, include but are not limited to notes in code, deposit slips, wired money transactions, savings pass books, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of controlled dangerous substances or other such documents which will contain identifying data on the co-conspirators. These items are kept in locations that are considered safe by the drug traffickers such as safety deposit boxes, residences, vehicles and on their person, where they have ready access to them. Drug traffickers may have several residences to decrease the likelihood of detection by law enforcement;

   b.     Drug traffickers often use stash houses to store quantities of their illegal drugs. Because of the danger that traffickers may be caught by law enforcement,

they often attempt to minimize the amount of time they carry drugs on their persons by picking up drugs from their stash house just before selling the drugs to others.

c.    Drug traffickers may use computers or other electronic storage media, including smart phones, to store the records of documents listed in paragraph a;

d.    Drug traffickers maintain on hand large amounts of cash to maintain and finance their narcotics business, which is typically concealed in their residences or vehicles along with financial instruments and evidence of financial transactions relating to narcotics trafficking activities;

e.    Drug traffickers use cellular telephones, pagers and other electronic communications devices to facilitate illegal drug transactions. The electronically stored information on these devices is of evidentiary value in identifying other members of the drug trafficking conspiracy and establishing the relationship between these individuals, including photographs and other identifying information stored on these devices;

f.    Drug traffickers commonly possess firearms and other weapons to protect and secure their narcotics and money from loss to law enforcement agents or other members of the criminal element that are motivated by greed; and

g.    Drug traffickers commonly possess packaging material, cutting agents, digital scales, and other items used in the preparation and packaging of controlled substances.

6.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for a complaint and does not set forth all my knowledge about this matter. Because I submit this affidavit for the limited purpose of establishing probable cause for the requested complaint, I have set forth only the information that I believe is necessary to establish probable cause. I have not, however, omitted information known to me that would defeat a finding of probable cause.

**II. PURPOSE OF AFFIDAVIT**

7.    Jason Ronald HACK, (DOB: 05/17/1995), is currently being held at Central Booking Intake Facility following the execution of federal search warrants on (1) his person, and (2) the location of 401 South Caroline Street, Baltimore, Maryland 21231 ("401 South Caroline"). This complaint seeks to charge HACK with the following:

a.  21 U.S.C. § 841(a)(1) – Possession with Intent to Distribute Controlled Substances;

b.  18 U.S.C. § 924(c) – Use and Carry of a Firearm During and in Relation to a Drug Trafficking Offense and Possession of a Firearm in Furtherance of a Drug Trafficking Offense; and

c.  18 U.S.C. § 922(k) – Possession of a Firearm with an Obliterated Serial Number.

**III. PROBABLE CAUSE**

8.   Law enforcement has investigated Jason Ronald HACK's suspected drug trafficking over the past months.  During this investigation, investigators utilized an undercover detective (UC-1) to purchase CDS, including suspected fentanyl and crack cocaine, from HACK.

9.   Investigators identified 401 South Caroline as a suspected stash location where they believed HACK stored CDS.  On multiple occasions, investigators observed HACK arrive to this location and utilize keys to go in and out.  Furthermore, investigators observed HACK arrive to and shortly thereafter leave from 401 South Caroline just prior to CDS purchases with UC-1.

10.   Based on these and other steps in the investigation, law enforcement obtained federal warrants on June 28, 2023 from United States Magistrate Judge A. David Copperthite to search 401 South Caroline and HACK's person (23-1810-ADC and 23-1811-ADC).

11.   On July 4, 2023, UC-1 contacted HACK to purchase CDS the following day.

12.   At 12:24 P.M. on July 5, UC-1 communicated to HACK that UC-1 was approximately 30 min from being in the area. During this time, law enforcement was setting up to

–4–

execute the warrants.

13.     At approximately 12:29 P.M., I observed a Black Toyota Sequoia bearing Maryland license plate 33722CJ arrive and park in front of 401 South Caroline Street. I immediately recognized this vehicle from previous surveillances of HACK including during a previous UC-1 purchase of CDS from HACK.

14.     Within seconds, HACK exited the driver side of the vehicle wearing a white t-shirt and pink shorts. HACK briefly walked towards the direction of Eastern Avenue, then returned back, utilized keys to open the front door of 401 South Caroline, and went inside. Simultaneously, a male later identified as D.B. exited the front passenger side of the vehicle.

15.     At approximately 12:30 P.M., HACK exited 401 South Caroline Street and both HACK and D.B. walked towards the body shop "Erick's Auto Service & Repair" located at 411 South Caroline Street. Both individuals entered the garage.

16.     At approximately 12:31 P.M., HACK returned back to 401 South Caroline Street and entered the driver seat of the Sequoia. Law enforcement then converged on HACK in the vehicle.

17.     As agents removed HACK from the vehicle, they observed in plain view four cellular phones on the driver seat, two baggies of suspected CDS on the center console and a silver and black handgun on the driver side floor, which was visible as it stuck out from underneath the driver seat. (See below photos)



18.      Agents later weighed the clear plastic baggies with suspected CDS and determined that one was approximately 16 grams and the other 15 grams. These substances are nearly identical in color and consistency to suspected CDS agents found inside 401 South Caroline, which field-tested positive for the presence of fentanyl.

19.      Agents inspected the firearm found on the floor sticking out from the driver seat where HACK had been seated. The firearm was a silver and black Smith and Wesson .40 caliber handgun loaded with approximately 10 .40 caliber rounds in its magazine and a round in chamber. The firearm's serial number was obliterated.

20.      Agents then moved to search 401 South Caroline.

21.      Inside, agents found more suspected CDS, including:

   a.  a Clear zip lock bag containing a partially pressed white substance with an approximate weight of 300 grams. This substance was found inside a safe in the rear living room area. A field tested yielded a positive result for fentanyl;

   b.  a metal cooking pan containing an off-white substance, which weighed

–6–

approximately 480 grams.[1]  The substance, which was nearly identical in color and consistency to the suspected CDS agents found on the center console of the vehicle HACK was driving, field tested positive for fentanyl. (See below photo)



22.    Inside the location, agents also found numerous firearms and ammunition, including:

a.    a Black Highpoint 9 mm handgun with 8 rounds in the magazine (Serial number P029559).  This firearm was in the same safe as the baggie containing 300 grams of presumptively positive fentanyl;

b.    a Glock 19 9mm handgun with a loaded extended magazine with 24 9mm rounds in the magazine and 1 round in the chamber. This firearm was in the

_____

1 This weight estimate is based finding on the total weight of the substance and the sheet pan and then subtracting the approximate weight of what agents believe the sheet pan to weigh, based on internet searches for pans of similar dimensions and materials.

same safe as the baggie containing 300 grams of presumptively positive fentanyl;

c. a black Mossberg Shotgun containing three slug rounds and two buck shot rounds. This firearm was in a hallway leading to a living room area;

d. a black Ruger .556 caliber rifle with a 30 round magazine inserted. The magazine contained two rounds. This firearm was in a hallway leading to a living room area; and

e. assorted other ammunition, including ammunition found in the same attached garage as a money counter and three heat sealed bags containing approximately three pounds of suspected marijuana.

23.     Agents also discovered multiple digital scales and money counters as well as other indicia of CDS distribution including kilo presses, chemicals used to prepare CDS for sale.

24.     Agents also discovered legal paperwork addressed to HACK pertaining to what appears to be a civil matter in another state involving him.

25.     Based on my training, knowledge, and experience, I know that individuals involved in the sale of narcotics commonly possess firearms in order to protect their product and protect themselves from other rival drug shops.

26.     Furthermore, the sheer amount of CDS as well as its colocation with scales and money counters indicates to me that HACK possessed the suspected fentanyl with the intent of distributing it.

27.     Based upon the above facts, I believe there is probable cause to believe that HACK has violated:

a. 21 U.S.C. § 841(a)(1) – Possession with Intent to Distribute Controlled

Substances;

b.  18 U.S.C. § 924(c) – Use and Carry of a Firearm During and in Relation to a Drug Trafficking Offense and Possession of a Firearm in Furtherance of a Drug Trafficking Offense; and

c.  18 U.S.C. § 922(k) – Possession of a Firearm with an Obliterated Serial Number.

-- Signature Page Follows --

1: 23-mj- 01902 BAH

I swear that the above information is true and correct to the best of my knowledge.

_A. Rodriguez_
TFO Albert Rodriguez
Drug Enforcement Administration

Subscribed and sworn to before me this _6th_ day of July, 2023.

_BL V_
Brendan A. Hurson
United States Magistrate Judge

____✓ FILED   ___ ENTERED
_____ LOGGED   _____ RECEIVED

**10:34 am, Jul 06 2023**

AT  BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____Deputy

–9–